IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 19, 2016

**RICKEY ALLEN HICKMAN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Marshall County**
**No. 15-CR-90      F. Lee Russell, Judge**

_____

**No. M2016-00489-CCA-R3-PC – Filed January 24, 2017**

_____

A Marshall County jury convicted the Petitioner, Rickey Allen Hickman, of one count of rape of a child and three counts of aggravated sexual battery. The trial court sentenced the Petitioner to a total effective sentence of forty-seven years of incarceration. On appeal, this Court affirmed the Petitioner's convictions. *State v. Rickey Allan Hickman*, No M2013-02390-CCA-R3-CD, 2014 WL 4557626 (Tenn. Crim. App., at Nashville, Sept. 16, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015). The Petitioner filed a petition for post-conviction relief alleging that his trial counsel had been ineffective. The post-conviction court held a hearing after which it denied the petition. On appeal, the Petitioner maintains that his trial counsel was ineffective for failing to present a defense asserting that the victim was raped by a person other than the Petitioner. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Matthew D. Wilson, Lewisburg, Tennessee, for the appellant, Rickey Allen Hickman.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert J. Carter, District Attorney General; and Weakley Edward Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Procedural History**

This case arises from sexual abuse allegations made against the Petitioner by the victim, his granddaughter. The Marshall County grand jury indicted the Petitioner on

charges of rape of a child and multiple counts of aggravated sexual battery. In his direct appeal, this Court summarized the evidence presented against the Petitioner at his trial as follows:

> At the [Petitioner's] trial, the following evidence was presented: Joey Kinder testified that he was married to Kimberly Kinder and that she had three children from a previous relationship. He stated that, in addition to his two children, Ms. Kinder's three children lived with the couple and that he was close with his step-children, who looked at him "as dad." He stated that, before August 2010, he had met Ms. Kinder's father, the [Petitioner], two or three times, and he recalled that the [Petitioner] "gave Ms. [Kinder] away" at their wedding on June 5, 2010. Mr. Kinder identified the [Petitioner] in the courtroom.
>
> Mr. Kinder stated that the [Petitioner] visited the Kinder's home during the period of April through August 2010. He stated that the victim, K.C., was present in the home during that time period. Mr. Kinder testified that, when the [Petitioner] came to visit the residence at the end of April 2010, K.C. "was like [my] shadow. Everywhere I went she was right there. I call it clingy. She was very clingy. I could not get away from her any way." Mr. Kinder stated that this was "unusual" behavior for K.C.
>
> Mr. Kinder testified that on August 13, 2010, he had a discussion with the victim. He stated that the victim climbed into his lap and began telling him about a class she had been in at school with a guidance counselor. The victim proceeded to tell him "something that [he] thought was important," "totally unsolicited," which prompted Mr. Kinder to speak with his wife about his conversation with the victim. After telling Ms. Kinder what the victim had said and speaking together with the victim, the couple contacted the Marshall County Sheriff's Department.
>
> On cross-examination, Mr. Kinder recalled that, during the [Petitioner's] visits to the family's home, Mr. Kinder had seen the other children sit on the [Petitioner's] lap, but he had never seen the victim do the same. Mr. Kinder stated that the [Petitioner] volunteered to keep the couple's children while they went on their honeymoon during the summer of 2010.
>
> Kimberly Kinder, the [Petitioner's] daughter, testified that her daughter, the victim, was born January 19, 2003, and was one of five children in the Kinder family. Ms. Kinder recalled a conversation she had

with the victim on August 13, 2010.  The victim told Ms. Kinder that she had been in a class at school "about not keeping secrets[.]"  Ms. Kinder learned that the victim had told Mr. Kinder her "secret" and stated that the victim also told her "what her secret was[.]"  Ms. Kinder stated that, after discussing the victim's "secret" with her husband, they contacted the Marshall County Sheriff's Department.  Ms. Kinder testified that an investigation by the sheriff's department ensued.

Ms. Kinder testified that at some point during the time period of September 1, 2009, through October 31, 2009, there was a party at the Kinder's house and that the [Petitioner] was in attendance.  The [Petitioner] was asked to go out and buy ice, and the victim asked to accompany him on the errand.  Ms. Kinder recalled that the [Petitioner] took the victim in his van to buy the ice.  Ms. Kinder learned later during the sheriff's department's 2010 investigation that an "incident" occurred while the [Petitioner] and the victim were in the van that day.  Ms. Kinder stated that one day, when she and the victim were riding around town, they came to an old warehouse, and the victim "got upset" and told her mother what had happened there.  Ms. Kinder reported to the sheriff's department what the victim said that day.

Ms. Kinder testified that during the time period of December 2, 2009, through December 11, 2009, she had surgery and the [Petitioner] offered to take care of her children while she recovered.  She stated that the [Petitioner] had opportunities to be alone with the victim during that time.

Ms. Kinder testified that during the time period of December 1, 2009, through December 31, 2009, she moved with her children into a new house to live with Mr. Kinder, and the [Petitioner] visited the family at this new residence.

On cross-examination, Ms. Kinder stated that she was getting along well with the [Petitioner] during the summer of 2010.  She agreed that the [Petitioner] and the victim were "pretty close" during that time.  She stated that, when the [Petitioner] was around, the victim would not sit in his lap or talk to the [Petitioner] as much as her other children.  Ms. Kinder stated that she asked the [Petitioner] to watch the children while she and Mr. Kinder went on their honeymoon for a couple of days in 2010.

K.C., the victim, testified that she was in the fifth grade at the time of trial and that Kimberly Kinder was her mom and Joey Kinder was her

3

dad. K.C. testified that she had three older siblings and one younger sibling and that the [Petitioner] was her "grandpa." She agreed that he was "not [her] grandpa anymore[,]" because "he did some things" to her. She stated that the [Petitioner] "touched" her three times and that the first time was in the [Petitioner's] van outside a warehouse. She stated that she and the [Petitioner] were getting ice for a family party, and she rode with him in the front seat of his van. She stated that they bought the ice but did not go straight home after that. K.C. recalled that the [Petitioner] parked his van behind a tree beside the warehouse and turned off the engine. He told K.C. to close her eyes, and then he reached in her pants "where the button is" on the front. She stated that the [Petitioner's] hands went all the way inside her pants. She recalled that she had underwear on and that his hand went inside of her underwear and touched her "private area." K.C. indicated for the jury that the [Petitioner] touched her "pubic area." K.C. stated that she did not want the [Petitioner] to touch her. She said that his hand touched near the opening of her vagina and that "part" of his hand went inside of the opening. K.C. said it felt "weird."

K.C. testified that the [Petitioner] then put her hand inside of his pants on the inside of his underwear. She said it felt "hairy" inside his underwear. K.C. stated that the [Petitioner] took her hand out of his pants, and then they drove in the van back to the family party. She stated that the [Petitioner] gave the ice he had bought to Ms. Kinder. K.C. recalled that the [Petitioner] told her, "don't tell or you will go to the devil[,]" and made her "pinky swear" that she would not tell anyone. She said it scared her that she would "go to the devil." K.C. testified that she did not tell her mother what had happened because she was scared of the [Petitioner]. After the touching incident, K.C. said she did not want to be around the [Petitioner] and that she stopped hugging him and sitting on his lap.

K.C. testified that the second time the [Petitioner] touched her was in her bedroom, during the time her mother was recovering from surgery. K.C. recalled that she got "sent to bed" for something that she did. The [Petitioner] came into her bedroom and said she could leave if she did a "favor" for him. The [Petitioner] told K.C. to close her eyes and reached his hand into her pants. She stated that she was wearing shorts and a tank top, or possibly pajama pants. K.C. stated that the [Petitioner] put his hand inside her underwear and touched her "private[,]" in the pubic area she had previously indicated to the jury. She recalled that his hand touched the opening to her vagina. K.C. stated that the [Petitioner] put her hand inside his pants and inside of his underwear and that it felt "hairy." K.C. stated

4

that the [Petitioner] told her not to tell and again said that she would "go to the devil" if she told anyone and that they did another "pinky swear." K.C. said she did not tell her mother about this incident because she was afraid of the [Petitioner].

K.C. testified that the third time the [Petitioner] touched her was in the bedroom of the new house her family had moved into in December 2009. She stated that she was cleaning her bedroom with her sister when the [Petitioner] came in the room and told her sister to leave. She said the [Petitioner] shut the door when he came into the room and that her sister was too little to reach the door knob, so she stayed in the room. With her little sister watching, the [Petitioner] told K.C. to close her eyes and he put his hands inside K.C.'s pants and underwear. K.C. stated that he touched her "private area" but said his hand did not go inside her vaginal opening. The [Petitioner] made K.C. promise not to tell and again warned her that she would "go to the devil" if she told anyone about the incident.

After those incidents, K.C. said that, when the [Petitioner] came to her house she would "stand by [her] dad the whole entire time" because she was afraid of the [Petitioner]. She stated that she watched a video at school about secrets and that the video "gave me a hint not to keep [the Petitioner's] secret no more." K.C. said she went home from school and told Mr. Kinder about the secret that the [Petitioner] had been putting his hand down her pants and touching her. She stated that her mother "freaked out" when K.C. told her the secret and then took her to the police department.

K.C. testified that she was driving with her mother when she saw the warehouse where the [Petitioner] had taken her and touched her inside the van. K.C. identified a picture of the warehouse and the picture was entered into evidence.

On cross-examination, K.C. stated that when the [Petitioner] touched her inside the van, his hand did not go inside her vagina but was "just like beside" her vagina. She clarified that "he didn't go in it[.]"

Bob Johnson testified that he was a Captain with the Marshall County Sheriff's Department and was the investigator assigned to this case. He stated that patrol officers took the initial incident report on August 13, 2010, and he coordinated an interview with the victim through the Department of Children's Services ("DCS"), which occurred on August 31,

2010. Captain Johnson stated that he never learned what happened in the interview because the DCS caseworker who conducted the interview left the Department. He stated that he spoke with the victim's mother on August 18, 2010, and spoke with the [Petitioner] on August 30, 2010. Captain Johnson said that he went to the [Petitioner's] residence in Murfreesboro, which was a moveable RV, and advised him that he was the subject of the investigation. Captain Johnson later learned from the [Petitioner's] daughter that the [Petitioner] had moved at the end of 2010.

Captain Johnson stated that another interview was set up with the victim to be conducted by a DCS worker on January 8, 2011. He stated that he watched the interview live on a television monitor and stated that the victim disclosed that the [Petitioner] had touched her three times, consistent with her trial testimony. Captain Johnson stated that in February 2011, he found the [Petitioner] in an RV park in Shelbyville and told the [Petitioner] he was a suspect in the case. Two weeks later, the [Petitioner] moved again and, when the captain was unable to locate the [Petitioner] by March 2011, he took a warrant out for the [Petitioner's] arrest. He stated that the [Petitioner] was not arrested until December 14, 2012, in Manchester, Tennessee.

Captain Johnson stated that the victim's mother was able to provide a time frame for when the touching occurred based on events that the victim could remember, such as picking up ice for the family party or Ms. Kinder's surgery.

Janice Hickman, the [Petitioner's] wife, testified that she was with the [Petitioner] and the victim on the day of the first incident when they drove to a store to buy ice for the family party. She stated that she was with the [Petitioner] and the victim the entire time. Ms. Hickman recalled being at the Kinder's home and that K.C. acted happy around the [Petitioner] and hugged him and sat in his lap.

The [Petitioner] testified that his wife was present on the day of the first incident when K.C. went with him to buy ice for the party. He stated that they drove straight home after going to the store, and he said he did not take K.C. to a warehouse. He testified that he never touched the victim inside of her clothes around the time of her mother's surgery, and he stated that he did not go into the bedroom where K.C. was cleaning up. He testified that he did not know what a "pinky swear" was and that he had never told K.C. not to tell anyone about anything. He stated that he had

6

never touched her and that he would never harm a child. The [Petitioner] explained that he moved during the investigation because the landlord did not want an accused child rapist living in the RV park. The [Petitioner] agreed that he did not show up for his scheduled meeting with Captain Johnson, but he stated that he did not know there was an ongoing investigation.

Based upon this evidence, the jury convicted the [Petitioner] of one count of rape of a child and three counts of aggravated sexual battery.

*Hickman*, 2014 4557626, at \*1-5 (footnote omitted). On appeal, this Court affirmed the Petitioner's convictions. *Id.* at \*1. The Tennessee Supreme Court denied his request for permission to appeal. *Id.*

## B. Post-Conviction Facts

The Petitioner filed a timely petition for post-conviction relief in which he alleged that his trial counsel had been ineffective for failing to present a defense based upon another person sexually assaulting the victim. He further contested the sufficiency of the evidence supporting his convictions. The trial court appointed counsel and held a hearing on the petition, during which the parties presented the following evidence: Brenda Robison, the Defendant's ex-wife, testified that Ms. Kinder was her daughter and that the victim was her granddaughter. Ms. Robison said that there had been several men who had lived with Ms. Kinder since the victim was born in 2009. She recalled that Ms. Kinder and the victim had lived with a man in Springfield, Tennessee when the victim was "younger." Ms. Robison said that she never spoke with the Petitioner's trial attorney, Counsel, about any men who had come into contact with the victim previously.

Counsel testified that he attempted to contact several of the prosecution's witnesses but that they refused to speak with him. Counsel agreed that, in this case, there were three possible scenarios: (1) the Petitioner abused the victim; (2) someone else had abused the victim; or (3) the victim was not abused at all. Counsel said that he focused exclusively on the theory that the victim fabricated the allegations of abuse. He said that he had no information that supported a theory that someone else had molested the victim. Counsel said that he had interviewed a man named "Mitch" who had lived with the victim's mother for some period of time. "Mitch," however, denied that he had anything to do with molesting the victim.

Counsel acknowledged that, at the time of the allegations, the victim was six or seven years old. She was nine or ten years old at the time of trial. He agreed that she gave "an awful lot of details, sexual detail when she testified." Therefore, based upon her

7

age and her sexual knowledge, he agreed that she had likely been sexually assaulted. He agreed that it was clear that "something had happened to the [victim]." He did not, however, offer a theory at trial that someone other than the Petitioner had molested the victim. Counsel said that he did not feel confident presenting a theory that "Mitch" had molested the victim because he had no evidence to support that theory.

Counsel agreed that the victim's testimony at trial was "fairly compelling." He said that he had viewed the DCS recorded interview of the victim. The victim's story during the interview was consistent with her trial testimony. The only inconsistency that Counsel noted was that during direct testimony, the victim said that the Petitioner had penetrated the "slit" to her vagina but that she denied as much on cross-examination. Counsel agreed that he knew that it would be hard to discredit the victim as a witness. Counsel again explained that he did not attempt to implicate someone else in this molestation because he did not have any evidence to support such a theory.

Counsel testified that his "biggest frustration" in this case was that the State had offered a plea agreement that contemplated that the Petitioner would enter a plea of guilty to sexual battery in exchange for an eight-year sentence. Counsel said he "tried and pleaded and begged" the Petitioner to take the offer, but the Petitioner refused, saying he was not guilty.

During cross-examination, Counsel testified that he interviewed multiple witnesses before trial, but the victim's mother would not allow him to interview the victim.

Based upon this evidence, the post-conviction court found:

[I]t is indeed a two-prong test. And I am not to determine, and when we're talking about ineffective assistance of counsel, the determination is not whether a defendant got a perfect defense or . . . whether there was a better defense available in the abstract, but rather did defense counsel reach the level of competency required of criminal defense attorneys in this situation. Did he have a defensible strategy. My belief and my very strong belief is that [Counsel] did not fall below the applicable standard. That he had, that he pursued not only a defensible strategy, but the only one he had. I don't see that there was anything else available. I quite agree, as I quipped a minute ago, that it's a safe thing to do and often the thing to do to plead in the alternative, especially in a civil case. But it is a potentially very dangerous thing to present alternative theories to a jury, especially when the alternative that is suggested is not supported by any evidence whatsoever. And maybe I'm, maybe I'm easing on to the second prong too soon, but

8

had [Counsel] begun to point fingers at someone, against whom there was no proof whatsoever, he would have lost all credibility with that jury in my opinion. So, I don't think he had that option. But whether he did or not, he certainly had a defensible strategy, which was to get this to a sexual battery as opposed to what was actually indicted. And there's just nothing in this record to suggest that Mitch was the perpetrator. Nothing that [the Petitioner] should have turned up that he didn't. Nothing that he did turn up that he didn't use. I think [Counsel] would have, with all due respect to him, looked rather foolish to try to shift the blame to somebody that, against whom there was no proof, whatsoever.

So, number one, I don't think his performance fell below the applicable standard for defense attorneys. And number two, I think there's just a total absence of any proof that but for [Counsel's] performance, but for [Counsel's] failure to point a finger at ["]Mitch["], that there would have been a different outcome. I believe very strongly that there would not have been a different outcome. The jury either believed or did not believe the young lady in this situation. They did believe her. They believed the part of her testimony on direct examination.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that Counsel was ineffective. He asserts that Counsel's representation fell "below an objective standard of reasonableness since he attempted to discredit altogether a witness whom he knew was telling the truth about being abused instead of discrediting the witness with regard to the identity of her perpetrator." The State counters that the post-conviction court properly denied the petition because Counsel employed a viable defense strategy rather than pursue the strategy involving "Mitch" because he had no evidence to support it.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-

conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly

deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a Petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, we conclude that the Petitioner has failed to show that trial counsel's performance was deficient or that trial counsel's performance caused him to suffer prejudice at trial. Counsel testified that he did not pursue a defense strategy placing blame for the sexual allegations on "Mitch" because he had no evidence to support such an allegation. The Petitioner's argument is essentially that Counsel was ineffective for failing to prepare and present a reasonable defense. He asserts that Counsel failed to present a defense insinuating that the victim was in fact sexually abused but that it was by someone other than the Petitioner.

We conclude that the Defendant was not deprived of a meaningful defense in this case. Counsel investigated this case, conducted adequate legal research, and determined what defense could be developed so as to hold the State to its burden of proof. *See Baxter*, 523 S.W.2d at 932-33. Counsel testified that there was no proof against the Petitioner other than the victim's testimony. The State had no fingerprints, no rape exam, and no other direct proof. Counsel impeached the victim, who changed her testimony about one of the incidents during cross-examination. The Petitioner had never before been in legal trouble. Counsel called the Petitioner's wife to testify, and she said that she was with the Petitioner and the victim during the time the victim alleged the first incident

occurred, and she refuted the victim's claims. Counsel then called the Petitioner to testify, and he said his wife was with him during the first alleged incident and denied that he ever inappropriately touched the victim. Counsel argued that the victim's allegations were untrue and that the Petitioner had not inappropriately touched her. Counsel did not pursue a claim that "Mitch" committed this offense because he had no evidence to support this allegation and felt the jury would not respond well to such a claim. This was a strategic decision. At the post-conviction hearing, the Petitioner did not offer further evidence that Mitch committed these offenses. We conclude that the Petitioner was not denied a meaningful defense and that Counsel's representation of him was not ineffective. The Petitioner is not entitled to relief.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE